**PELTON GRAHAM LLC**
Brent E. Pelton (BP 1055)
Taylor B. Graham (TG 9607)
111 Broadway, Suite 1503
New York, NY 10006
Telephone: (212) 385-9700
www.PeltonGraham.com

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **MEHMED AHMETASEVIC, MIZRA AHMETASEVIC and ALEX PETROVSKI, Individually and on Behalf of All Others Similarly Situated,** | **17 Civ. 01167 (GHW)** |
| **Plaintiffs,** | |
| -against- | **AMENDED CLASS & COLLECTIVE ACTION COMPLAINT** |
| **ETHOS GALLERY 51, LLC d/b/a ETHOS GALLERY 51, 75 HA RESTAURANT LLC d/b/a THE BBG, LITTLE WEST RESTAURANT, LLC d/b/a PATHOS CAFÉ, CHRISTOS PANAGIOTOPOULOS and IOANNIS CHATIRIS, Jointly and Severally,** | **Jury Trial Demanded** |
| **Defendants.** | |

Plaintiffs Mehmed Ahmetasevic, Mizra Ahmetasevic, and Alex Petrovski ( the "Plaintiffs"), individually and on behalf of all others similarly situated, as class representatives, upon personal knowledge as to themselves and upon information and belief as to other matters, allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs are former servers and managers and a former busser, runner and expediter at Defendants' two (2) Greek restaurants in Manhattan and steakhouse in Williston Park, New York. For their work, Plaintiffs either did not receive wages of any kind for certain hours worked, received payments that derived entirely from customers' tips, with no hourly wage, or were paid a flat salary that did not vary with the number of hours worked.

2.      Defendants' payment schemes resulted in systemic underpayment of wages to Plaintiffs and Defendants' other restaurant employees in violation of federal and state wage laws.

3.      Plaintiffs bring this action to recover unpaid minimum wages and overtime premium pay owed to them pursuant to both the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.* and the New York Labor Law ("NYLL"), §§ 650 *et seq.*  Plaintiffs also bring claims for unpaid spread-of-hours premiums, unlawfully withheld gratuities, unreimbursed business expenses and for failure to provide proper wage notices and wage statements, pursuant to NYLL §§ 190 *et seq.* and the supporting regulations.

4.      Plaintiffs bring their FLSA claims on behalf of themselves and all other similarly situated employees of Defendants and their NYLL claims on behalf of themselves and a Federal Rule of Civil Procedure 23 class of all servers, bussers, runners, expediters and other non-management employees working for Defendants in New York.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1337, and 1343, and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.  In addition, the Court has jurisdiction over Plaintiffs' claims under the FLSA pursuant to 29 U.S.C. § 216(b).

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district and Defendants' business is located in this district.

7.      This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## THE PARTIES

**Plaintiffs:**

8.      Plaintiff Mehmed Ahmetasevic was, at all relevant times, an adult individual residing in Hudson County, New Jersey.

9.      Plaintiff Mizra Ahmetasevic was, at all relevant times, an adult individual residing in Queens County, New York.

10.     Plaintiff Alex Petrovski was, at all relevant times, an adult individual residing in Hudson County, New Jersey.

11.     Throughout the relevant time period, Plaintiffs performed work for Defendants at "Ethos Gallery 51," located at 905 First Avenue, New York, NY 10022. Plaintiff Ahmetasevic additionally performed work at "Pathos Café," located at 932 First Avenue, New York, NY 10022, and "The BBG," located at 75 Hillside Avenue, Williston Park, NY 11596, during the relevant time period.

12.     Plaintiffs consent in writing to be party to this action, pursuant to 29 U.S.C. § 216(b), and their consent forms are attached hereto.

**Defendants:**

13.     ETHOS GALLERY 51, LLC is a New York limited liability company doing business as "Ethos Gallery 51," with its principal place of business at 905 First Avenue, New York,

3

NY 10022.

14.     LITTLE WEST RESTAURANT, LLC is New York limited liability company doing business as "Pathos Café," with its principal place of business at 932 First Avenue, New York, NY 10022.

15.     75 HA RESTAURANT LLC is a New York limited liability company doing business as "The BBG," with its principal place of business at 75 Hillside Avenue, Williston Park, NY 11596.

16.     Ethos Gallery 51, LLC, Little West Restaurant, LLC and 75 HA Restaurant LLC are hereinafter referred to collectively as the "Corporate Defendants."

17.     At all relevant times, the Corporate Defendants operated together as a single business enterprise, with the same employment policies, including wage-and-hour policies.

18.     The Corporate Defendants' operations are interrelated and unified and are a single enterprise and/or joint employer of Plaintiffs.

19.     Defendant Christos Panagiotopoulos ("Panagiotopoulos") is an owner and operator of the Corporate Defendants. Panagiotopoulos sets the Corporate Defendants' payroll policies, including the unlawful practices complained of herein. Throughout the relevant time period, upon information and belief, Panagiotopoulos was in charge of determining the Corporate Defendants' policies with respect to payroll, and otherwise running the business of the Corporate Defendants.

20.     Defendant Ioannis Chatiris ("Chatiris") is an owner and operator of the Corporate Defendants. Chatiris sets the Corporate Defendants' payroll policies, including the unlawful practices complained of herein. Throughout the relevant time period, upon information and belief, Chatiris was in charge of determining the Corporate Defendants' policies with respect to payroll, and otherwise running the business of the Corporate Defendants.

21.     Defendants Panagiotopoulos and Chatiris are hereinafter referred to collectively as the "Individual Defendants" and, together with the Corporate Defendants, the "Defendants."

22.     The Individual Defendants maintained operational control over the Corporate Defendants and jointly managed the Corporate Defendants by determining the wages and compensation of employees, establishing the schedules of employees, maintaining employee records, and through possessing the authority to hire and fire employees, including Plaintiffs.

23.     The Individual Defendants jointly employed Plaintiffs and all similarly situated employees by acting in the interest of each other with respect to the employees, paying employees by the same methods and sharing control over the employees.

24.     The Individual Defendants participated in the day-to-day operations of the Corporate Defendants and acted intentionally in their direction and control of Plaintiffs and the Corporate Defendants' other similarly situated employees, and are "employers" pursuant to the FLSA, 29 U.S.C. § 203(d) and regulations thereunder, 29 C.F.R. § 791.2, as well as the NYLL § 2 and the regulations thereunder, and are jointly and severally liable with the Corporate Defendants.

25.     At all relevant times, Defendants have been and continue to be employers engaged in interstate commerce and/or the production of goods for commerce, within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207 (a).

26.     At all relevant times, Defendants employed, and/or continue to employ, Plaintiffs and each of the Collective Action members within the meaning of the FLSA.

27.     At all relevant times, Plaintiffs, the opt-in plaintiffs and the Class Members were employed by Defendants within the meaning of the NYLL, §§ 2 and 651.

28.     Upon information and belief, at all relevant times, the Corporate Defendants have

had gross revenues in excess of $500,000.00.

## FLSA COLLECTIVE ACTION ALLEGATIONS

29.    Pursuant to 29 U.S.C. §§ 206, 207 & 216(b), Plaintiffs brings their First and Second

Causes of Action as a collective action under the FLSA on behalf of themselves and the following

collective:

> All persons employed by Defendants at any time since February 15,
> 2014 and through the entry of judgment in this case (the "Collective
> Action Period") who worked as servers, bussers, runners,
> expediters, bartenders, and other non-management employees (the
> "Collective Action Members").

30.    A collective action is appropriate in this circumstance because Plaintiffs and the

Collective Action Members are similarly situated, in that they were all subjected to Defendants'

illegal policies of failing to pay minimum wages for all hours worked and failing to pay overtime

premiums for work performed in excess of forty (40) hours each week.  As a result of these

policies, Plaintiffs and the Collective Action Members did not receive the legally-required

minimum wages for all hours worked and overtime premium payments for all hours worked in

excess of forty (40) hours per week.

31.    Plaintiffs and the Collective Action Members have substantially similar job duties

and are paid pursuant to a similar, if not the same, payment structure.

## RULE 23 CLASS ACTION ALLEGATIONS

32.    Pursuant to the NYLL, Plaintiffs bring their Third through Eighth Causes of Action

under Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following

class:

> All persons employed by Defendants in New York at any time since
> February 15, 2011 and through the entry of judgment in this case
> (the "Class Period") who worked as servers, bussers, runners,
> expediters, bartenders and other non-management employees (the
> "Class Members").

33.    <u>The Class Members are readily ascertainable</u>. The number and identity of the Class Members are determinable from the records of Defendants. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided by means permissible under Fed. R. Civ. P. 23.

34.    <u>The Class Members are so numerous that joinder of all members is impracticable</u>. Although the precise number of Class Members is unknown to Plaintiff, the facts on which the calculation of that number can be based are presently within the sole control of Defendants.

35.    Upon information and belief, there are well in excess of forty (40) Class Members.

36.    <u>Common questions of law and fact exist as to all Class Members and predominate over any questions solely affecting the individual members of the Class</u>.  Such common questions will determine Defendants' liability to all (or nearly all) Class Members. These common questions include, but are not limited to:

a.  whether Defendants employed Plaintiffs and the Class Members within the meaning of the NYLL;

b.  whether Defendants failed to keep true and accurate time records for all hours worked by Plaintiffs and the Class Members;

c.  whether Defendants failed and/or refused to pay Plaintiffs and the Class Members wages for all hours worked;

d.  whether Defendants failed and/or refused to pay Plaintiffs and the Class Members minimum wage for all hours worked;

e.  whether Defendants properly notified Plaintiffs and the Class Members that they were taking the tip credit;

f.  whether Defendants failed and/or refused to pay Plaintiffs and the Class Members

overtime premiums for hours worked in excess of forty (40) hours per workweek;

g.  whether Defendants failed to pay Plaintiffs and the Class Members an extra hour of minimum wage when working shifts in excess of ten (10) hours or split shifts;

h.  whether Defendants illegally retained gratuities left by customers and failed to pay all such gratuities to Plaintiffs and the Class Members;

i.  whether Defendants failed to reimburse Plaintiffs for the cost of bounced checks;

j.  whether Defendants failed to provide Plaintiffs and the Class Members with a proper statement of wages with every wage payment as required by the NYLL;

k.  whether Defendants failed to provide proper wage notice to Plaintiffs and Class Members at the beginning of their employment and/or on February 1 of each year as required by the NYLL;

l.  whether Defendants' failure to properly pay Plaintiffs and the Class Members lacked a good faith basis; and

m.  whether Defendants are liable for all damages claimed hereunder, including but not limited to compensatory damages, liquidated damages, interest, costs and disbursements and attorneys' fees.

37.     Plaintiffs' claims are typical of the Class Members' claims.  Plaintiffs, like all Class Members, are restaurant employees of Defendants who worked for Defendants pursuant to their corporate policies.  Plaintiffs, like all Class Members, were, *inter alia*, paid less than the statutory minimum wage for all hours worked, were not paid overtime premium pay for hours worked over forty (40) hours in a given workweek, were not paid spread-of-hours premiums when their shifts extended more than ten (10) hours per day, were not paid all gratuities to which they were entitled, were not reimbursed for the cost of bounced checks, and did not receive proper wage statements

or wage notices. If Defendants are liable to Plaintiffs for the claims enumerated in this Complaint, they are also liable to all Class Members.

38.     <u>Plaintiffs and their Counsel will fairly and adequately represent the Class</u>. There are no conflicts between Plaintiffs and the Class Members, and Plaintiffs bring this lawsuit out of a desire to help all Class Members, not merely out of a desire to recover their own damages.

39.     Plaintiffs' counsel are experienced class action litigators who are well-prepared to represent the interests of the Class Members.

40.     <u>A class action is superior to other available methods for the fair and efficient adjudication of this litigation</u>.

41.     Defendants are sophisticated parties with substantial resources. The individual plaintiffs lack the financial resources to vigorously prosecute a lawsuit in federal court against corporate defendants.  The individual members of the Class have no interest or capacity to bring separate actions; Plaintiffs are unaware of any other litigation concerning this controversy, except for *Legantis et al v. Ethos Gallery 51, LLC et al*, docket number 16-cv-8198; and there are no likely difficulties that will arise in managing the class action.

<b><u>STATEMENT OF FACTS</u></b>

<u>**Defendants' Restaurants**</u>

42.     At all relevant times, Defendants have been in the food service business. Upon information and belief, Defendants currently own, operate and manage at least four (4) restaurants in New York, including: Ethos Gallery 51 at 905 First Avenue, New York, NY 10022; Pathos Café at 932 First Avenue, New York, NY 10022; BBG at 75 Hillside Avenue, Williston Park, NY 11596; and Kyma at 1446 Old Northern Boulevard, Roslyn, NY 11576.

43.     Upon information and belief, Ethos Gallery 51 is open from 12:00 pm to 11:00 pm

seven (7) days per week, Pathos Café is open from 7:00 am or 10:00 am to 11:00 pm or 12:00 am seven (7) days per week, and BBG is open from 12:00 pm or 1:00 pm to between 9:00 pm and 10:30 pm seven (7) days per week.

44.     Ethos Gallery 51, LLC was registered with the New York State Department of State, Division of Corporations on May 24, 2011.

45.     Little West Restaurant, LLC was registered with the New York State Department of State, Division of Corporations on March 6, 2014.

46.     75 HA Restaurant LLC was registered with the New York State Department of State, Division of Corporations on October 23, 2013.

47.     Upon information and belief, Defendant Chatiris is a part owner and general manager of Defendants' restaurants. Upon information and belief, throughout the class period, Defendant Chatiris has been present at Ethos Gallery 51 and Pathos Café on a near daily basis and approximately once per week at BBG.

48.     Plaintiffs Ahmetasevic and Petrovski frequently observed Chatiris at Ethos Gallery 51, and Plaintiff Ahmetasevic observed Chatiris at Pathos Café and BBG, supervising employees, making employee schedules, ordering food and other supplies, giving orders to managers and employees, and overseeing the operations of the business. Plaintiff Ahmetasevic further alleges that Chatiris instructed him where to work when he was periodically moved to different restaurant locations.

49.     Upon information and belief, although Defendant Panagiotopoulos was present in the restaurant several times per year for approximately one (1) week at a time.  Throughout their employment, Plaintiffs frequently heard Defendant Chatiris and "Maria," an accountant and manager, on the phone with Panagiotopoulos, reviewing employee hours and other payroll

information and getting approval for food, liquor and other supply orders.  Upon information and belief, Chatiris, "Maria" and other managers frequently sent information relating to payroll, including employee hours, and orders for food and other supplies, to Panagiotopoulos via e-mail for approval.  Further, when Panagiotopoulos was present at the restaurants, Plaintiffs frequently observed him giving orders to managers and employees, bringing products into the restaurant, and generally overseeing the operations of the businesses. Upon information and belief, "Maria" often physically wrote employees' checks, based on instructions from Defendant Panagiotopoulos as to how they should be paid.

50.     Based on conversations with other employees and their observations of Defendants' restaurants, Plaintiffs are aware that Defendant Panagiotopoulos occasionally called employees' personal cell phones from Greece to admonish them if he became aware of certain practices that he disagreed with (e.g., closing the restaurant late or serving customers drinks on the house).

51.     Upon information and belief, employees at Defendants' restaurants were not paid for time that they spent training on the job.

**Plaintiffs' Work for Defendants**

52.     <u>Plaintiff Mehmed Ahmetasevic</u> was employed by Defendants as a server at Ethos Gallery 51 from in or around June 2013 through in or around October 2015.  Plaintiff alleges that Defendant Chatiris sent him to work at BBG in Williston Park, New York for approximately one (1) month from in or around November 2015 through December 2015, before sending him to Pathos Café from in or around December 2015 through approximately June 2016.

53.     Plaintiff alleges that he returned to Ethos Gallery 51 from in or around July 2016 through approximately October 2016, when Defendant Chatiris sent him back to Pathos Café to work as a head waiter for approximately one (1) month.  During this period, Mehmed was required

to contact Defendant Panagiotopoulos via e-mail to get approval prior to ordering supplies or arranging for repairs and spent the vast majority of his time performing server duties, with the limited added responsibilities of signing for deliveries, answering phones and making sure that employees arrived at work on time.

54.     In addition to his duties as a head waiter at Pathos Café, Mehmed occasionally worked as a bartender and salad maker.

55.     Mehmed returned to Ethos Gallery 51 in or around November 2016, where he worked as a server until approximately December 2016 (the period between June 2013 and December 2013 shall hereinafter be referred to as the "Mehmed Ahmetasevic Employment Period").

56.     From in or around June 2013 through in or around August 2015, when Mehmed worked at Ethos Gallery 51, he typically worked five to seven (5-7) days per week, for a total of approximately fifty-five (55), and sometimes up to seventy (70), hours per week.   From approximately August 2015 through in or around November 2015, Mehmed worked approximately five to six (5-6) days per week, for an average of approximately fifty to sixty (50-60) hours per week.

57.     From approximately November 2015 through December 2015, when Mehmed worked at BBG, he typically worked five (5) days per week for a total of approximately thirty-five (35) hours per week.

58.     From approximately December 2015 through in or around June 2016, when Mehmed worked at Pathos Café, he typically worked six (6) days per week, for a total of approximately sixty (60) hours per week.

59.     From approximately July 2016 through approximately October 2016, when

Plaintiff Mehmed returned to Ethos Gallery 51, he typically worked five to six (5-6) days per week for a total of approximately fifty to sixty (50-60) hours per week.

60.     From approximately October 2016 through November 2016, when Mehmed worked as a head waiter at Pathos Café, he typically worked six (6) days per week, for an average of forty-eight (48) hours per week.

61.     From approximately November 2016 through the end of the Mehmed Ahmetasevic Employment Period, when Plaintiff returned to Ethos Gallery 51 as a server, he typically worked an average of forty to forty-five (40-45) hours per week.

62.     Mehmed alleges that from in or around June 2013 through approximately August 2015, when Plaintiff initially worked at Ethos Gallery 51, and again from November 2015 through December 2015, when Mehmed worked at BBG, he was paid with a business check containing an amount that was derived entirely from customers' tips.

63.     From in or around August 2015 through in or around November 2015 and again from in or around December 2015 through October 2016, Mehmed typically received a paystub showing payment for fifty (50) "regular" hours at five dollars ($5.00) per hour and ten (10) "overtime" hours at seven dollars and fifty cents ($7.50) per hour, or one and one-half (1.5) times his alleged regular hourly rate. During this period, Plaintiff typically received a business check, in addition to the paystub, for the remainder of his total tip amount, such that the combined amount on the paystub and business check matched the amount that had been allocated to him in tips from the tip pool for that particular pay period.

64.     From October 2016 through November 2016, when Mehmed worked as a head waiter at Pathos Café, he was paid a flat salary of approximately one thousand five hundred dollars ($1,500.00) through a combination of payroll check and business check, pursuant to Defendant

Panagiotopoulos's offer to pay him above whatever tip amount he received as a server that week, such that he earned a flat salary each week.

65.     When Mehmed returned to Ethos Gallery 51 as a server from in or around November 2016 through December 2016, after Defendants implemented the time clock, Plaintiff was paid entirely with a paystub showing an hourly rate of five dollars ($5.00) per hour and an overtime rate of seven dollars and fifty cents ($7.50) per hour.  Although Plaintiff generally clocked in and out when he arrived at and left the restaurant, Plaintiff alleges that there were typically around one to three (1-3) hours missing from his payment each week during this period.

66.     Plaintiff further alleges that towards the beginning of the Mehmed Ahmetasevic Employment Period, Defendant Chatiris informed him that Defendants did not need to pay him an hourly wage because he did not have his "papers." However, even after Mehmed received his Social Security Number in or around August 2015, and Defendants began providing him a paystub showing an alleged "hourly rate," Mehmed did not receive an hourly wage until he was required to start clocking in and out when he returned to Ethos Gallery 51 in or around November 2016.

67.     Plaintiff Mizra Ahmetasevic was employed by Defendants as a server at Ethos Gallery 51 from in or around April 2013 through in or around September 2016. Plaintiff Mizra Ahmetasevic subsequently worked as a manager from in or around September 2016 through mid-June 2017 (the period between April 2013 and mid-June 2017 shall hereinafter be referred to as the "Mizra Ahmetasevic Employment Period"). Although his duties as a manager primarily consisted of managerial tasks, such as speaking with vendors, preparing employee schedules and organizing events at the restaurant, Mizra  did not have the power to hire or fire employees.

68.     As a manager, Mizra typically spoke with Defendant Panagiotopoulos on a daily basis about the operations of the restaurant and had to receive approval before moving forward

with supply orders or wine deals.

69.     Plaintiff Mizra Ahmetasevic alleges that, when he worked as a sever, he generally worked an average of sixty (60) hours per week, excepting a period of approximately four (4) months between December 2015 and April 2016 when he worked two (2) double shifts per week, for an average of approximately twenty-five (25) hours per week. During the time that he worked as a manager, he typically worked an average of fifty (50) hours per week.

70.     Plaintiff Mizra Ahmetasevic alleges that from in or around April 2013 through June or July 2013, he was paid in entirely in cash by Defendant Chatiris. Mizra began receiving business checks, and occasionally a combination of business checks and cash, from Defendant Chatiris in or around June or July 2013.

71.     Plaintiff Mizra Ahmetasevic alleges that he began receiving payroll checks from Defendants in or around September 2013. Although he generally worked an average of sixty (60) hours per week, the payroll checks that he received typically showed an average of forty-five to fifty (45-50) hours at the tipped minimum wage. Plaintiff alleges that he typically received a business check, in addition to the payroll check, for the remainder of his total tip amount, such that the combined amount on the paystub and business check matched the amount that had been allocated to him in tips from the tip pool for that particular pay period.

72.     Plaintiff Mizra Ahmetasevic alleges that from in or around December 2015 through April 2016, when he worked approximately twenty-five (25) hours per week, he typically received payroll checks for approximately one thousand dollars ($1,000.00) for forty (40) hours of work. Mizra alleges that Defendant Chatiris would typically require him to pay back the difference between his total tip amount for the week and the amount on the payroll check.

73.     Plaintiff Mizra Ahmetasevic alleges that when he worked as manager between

approximately September 2016 and June 2017, he was paid a flat salary of one thousand five hundred dollars ($1,500.00) via business check.

74.     Plaintiff Mizra Ahmetasevic alleges that on approximately three to four (3-4) occasions, Defendants deducted between fifty dollars ($50.00) and seventy-five dollars ($75.00) from his and other servers' payments, which were comprised entirely of customers' tips, to pay a daytime bartender who was paid a fixed salary pursuant to an agreement with Defendant Panagiotopoulos.

75.     Plaintiff Petrovski worked for Defendants as a busser, runner, expediter and "manager" at Ethos Gallery 51 from in or around June 2013 through in or around February 2017 (the "Petrovski Employment Period"). During the Petrovski Employment Period, Plaintiff occasionally also performed catering work, made deliveries and worked in the kitchen as a line cook.

76.     Plaintiff Petrovski alleges that he worked at Ethos Gallery 51 as a busser for the first approximately seven to eight (7-8) months of the Petrovski Employment Period.  Plaintiff subsequently worked as a runner for approximately one (1) year, and an expediter until approximately fall 2016, when he became a "kitchen manager."  Although Defendants referred to him as a "manager" during the last approximately five (5) months of his employment, Petrovski primarily worked as an expediter during this period.

77.     From the beginning of the Petrovski Employment Period through in or around November or December 2016, Plaintiff Petrovski worked six to seven (6-7) days per week, for a total of sixty-five to sixty-eight (65-68) hours per week, and sometimes as many as seventy to seventy-five (70-75) hours per week.  Plaintiff alleges that for the last few months of his employment with Defendants, he worked five (5) days per week, for a total of forty-five to forty-

six (45-56) hours per week.

78.     Plaintiff alleges that for the first seven to eight (7-8) months of the Petrovski Employment Period, when he worked as a busser, he was paid with a business check containing an amount that was derived entirely from customers' tips.

79.     Plaintiff Petrovski alleges that for a brief period after he became a runner, he began receiving a payroll check showing payment for forty (40) hours at his alleged "hourly rate" of five dollars ($5.00) per hour. During this time, Plaintiff additionally received a business check from Defendants with each payment such that the net amount on the payroll check and the total amount on the business check added up to his total allocation from the tip pool.

80.     Plaintiff Petrovski alleges that shortly after he had started working as a runner, Defendant Chatiris asked him how much he earned under the tip pool.  When Petrovski replied that he generally made around nine hundred dollars ($900.00) in tips, Chatiris told him that he would pay him an additional two hundred dollars ($200.00), or a flat salary of one thousand one hundred dollars ($1,100.00), if he took on minor additional duties, including speaking with health inspectors and the fire department and performing occasional handyman work.

81.     Plaintiff alleges that he was paid a salary of one thousand one hundred dollars ($1,100.00) for approximately one (1) year.  During this period, Plaintiff typically received a payroll check showing payment for forty (40) hours at his alleged "hourly rate" of five dollars ($5.00) per hour and a business check for the difference of the amount on the paystub and his total salary of one thousand one hundred dollars ($1,100.00). Defendants also occasionally issued Petrovski a business check for the entire amount of one thousand one hundred dollars ($1,100.00).

82.     During the approximately one (1) year that Plaintiff Petrovski worked exclusively as an expediter, he was paid entirely from the tip pool as though he were working as a server.  Once

again, Plaintiff was paid with a payroll check showing payment for forty (40) hours at his alleged "hourly rate" of five dollars ($5.00) per hour and a business check for the remainder of his allocation from the tip pool during this period.

83.     In or around October 2016, when Plaintiff Petrovski worked as an expediter/"manager," and after Defendants implemented a time clock, he began receiving paystubs showing payment for forty (40) hours at seven dollars and fifty cents ($7.50) per hour and five to ten (5-10) overtime hours at twelve dollars ($12.00) per hour, despite the fact that Petrovski generally worked approximately sixty to seventy (60-70) hours during this time.

84.     Shortly after Petrovski complained to Defendant Panagiotopoulos that he was not being paid for all hours that he worked, "Maria," an accountant and manager of Defendants, gave him a check for six hundred and ninety dollars ($690.00), which was meant to compensate Petrovski for all of the hours that Defendants had shaved from his payments from October 2016 through November 2016.  "Maria" informed Plaintiff during this meeting that although the gross amount on the check was one thousand dollars ($1,000.00), Defendant Panagiotopoulos had deducted thirty percent (30%) from the gross amount in "taxes."  While Maria informed Petrovski that Panagiotopoulos had "done the math," Petrovski was never provided with a breakdown of the withholdings.

85.     Plaintiff Petrovski further alleges that after Defendants implemented the time clock in or around October 2016, Defendants would frequently edit employees' clock-in and clock-out times such that there would generally be several hours missing from their payment each week. Edits to clock-in and clock-out times would be reflected in yellow comment bubbles on Defendants' online timekeeping system.  For example, a yellow comment bubble above Petrovski's clock-in and clock-out times for December 16, 2016 indicates that on December 20,

2016, "Ioannis Chatiri," changed Petrovski's clock-out time from 3:35 pm to 3:30 pm, and finally to 3:00 pm.  Upon information and belief, Defendants' online timekeeping system further indicates that Defendants made thirty-nine (39) changes to Petrovski's hours between July 1, 2016 and October 30, 2016.

86.     Upon information and belief, Defendants would retain a portion of the tips to which employees who worked large private events at Defendants' restaurants were entitled.  During private events, Defendant Chatiris would often simply tell servers that they were receiving a certain amount in tips at the end of the night, without disclosing the total amount of the bill.  Plaintiffs would occasionally come across the details of the transaction in the restaurant's records at a later date or hear Chatiris telling other employees the amount of the bill, while informing them that the restaurant had had a "good night" or made "good money" from the event.  Based on their observations, Plaintiffs were able to discern that the amount that they had received in tips from working large events did not add up to the amount that should have been allocated to tipped workers, based on a twenty percent (20%) gratuity. Plaintiff Ahmetasevic, who worked approximately fifty to sixty (50-60) private events during his employment with Defendants, alleges that there was generally around three percent to five percent (3%-5%) missing from the tip amount that he received.

87.     Upon information and belief, for a period of at least several months, Samoil Risteski took a portion of the tips in the tip pool, despite the fact that his job duties primarily involved managerial tasks, such as closing the restaurant and making employee schedules.

88.     Upon information and belief, Defendant Chatiris often took a portion of the tips in the tip pool for himself, despite his role as a part owner and manager of Defendants' restaurants. Specifically, Plaintiffs allege that busboys were typically paid a flat rate of fifty dollars ($50.00)

for a lunch shift and one hundred dollars ($100.00) for a dinner shift. However, busboys were allocated five (5) points from the tip pool, or half the amount that servers received. It is Plaintiffs' belief that if busboys were entitled to more money from the tip pool than their $50.00 or $100.00 flat rate at the end of the shift, Defendant Chatiris kept the difference.

89.     When Petrovski worked as a busser, expediter and runner, prior to being paid a salary, his wages consisted entirely only of credit card tips.  Petrovski only began receiving cash tips for his work during the last five (5) months of his employment, when he worked as an expediter and "manager."

90.     Throughout their respective employment periods, Plaintiffs typically received their payments from Defendant Chatiris.  Around approximately fall 2016, Plaintiffs began receiving their payments from "Maria," an accountant and manager for Defendants' restaurants.  Plaintiffs further allege that throughout their employment with Defendants, Defendants frequently delayed their payments by up to two to four (2-4) weeks, at which point they would pay them their back "wages" for the time period for which they had neglected to pay them, and rarely paid them at set intervals.

91.     Plaintiffs further allege that on several occasions when trying to collect their payments, the checks that Defendants provided would bounce, and Plaintiffs would be charged a fee per bounced check by their respective banks. Defendants did not reimburse Plaintiffs for these bounced check fees.

**Defendants' Unlawful Corporate Policies**

92.     For the majority of Plaintiffs' respective employment periods, Defendants did not maintain any formal timekeeping system through which Defendants' employees tracked their hours worked.  Defendants implemented a time clock in or around October 2016 whereby Plaintiffs

clocked in and out by typing in their employee codes.

93.     Upon information and belief, tipped employees, including servers, bussers, runners and expediters, were paid only from customers' tips and did not receive an hourly wage until the implementation of the time clock in or around October 2016.  Although Defendants gave certain tipped employees payroll checks showing an alleged hourly rate and overtime rate, the total amount that tipped employees received in their weekly payment was generally equivalent to their share from the tip pool.  Plaintiffs have had numerous discussions with other tipped employees of Defendants' restaurants who similarly did not receive an hourly wage of any kind during the Relevant Time Period.

94.     Based on Plaintiffs' observations of the workplace and Defendants' payroll records, upon information and belief, kitchen employees, including dishwasher and cooks, received a flat salary that did not vary with the number of hours that they worked and thus, did not receive proper overtime pay for hours worked in excess of forty (40) hours per week.

95.     Defendants' failure to pay Plaintiffs minimum wage for all hours worked is a corporate policy of Defendants which applies to all of their servers, bussers, runners, expediters and other tipped employees throughout the relevant time period. While Plaintiffs received a paystub during approximately the last month of his employment with Defendants, after Defendants implemented the time clock, showing payment for certain hours at the tipped minimum wage, Defendants did not provide Plaintiffs with written notice, or in any way notify Plaintiffs, that Defendants were taking the tip credit in calculating their hourly rate, nor did Defendants provide to Plaintiffs a wage notice setting forth their hourly rates, Defendants' taking of the tip credit, or any deductions that would be subtracted from their wages.

96.     Defendants' failure to pay Plaintiffs overtime compensation of one and one-half

(1.5) times their regular hourly rates for hours over forty (40) each week was a corporate policy of Defendants which applied to all of their servers, bussers, runners, expediters and other restaurant employees throughout the relevant time period.

97.     Defendants' failure to pay Plaintiffs spread-of-hours premiums for days in which Plaintiffs worked a spread of more than ten (10) hours or a split shift was a corporate policy which applied to all of their servers, bussers, runners, expediters and other restaurant employees who worked more than ten (10) hours in a day and/or a split shift throughout the relevant time period.

98.     Upon information and belief, throughout the Class Period and continuing until today, Defendants unlawfully retained gratuities received from customers that should have been passed along to servers, bussers, runners, expediters and other tipped employees, particularly those working large private events at Defendants' restaurants.

99.     Defendants did not provide Plaintiff or Class Members with proper wage notices at the time of hire or by February 1 of each year.

100.    Plaintiffs and the Class Members were all paid pursuant to the same corporate policies of Defendants, including failing to pay minimum wages and overtime premiums.

101.    Plaintiffs' work was performed in the normal course of Defendants' business and was integrated into Defendants' business.

102.    The work performed by Plaintiffs required little skill and no capital investment.

103.    Throughout the Class Period and, upon information and belief, continuing until today, Defendants have likewise employed other individuals like Plaintiffs in positions that require little skill and no capital investment.  Upon information and belief, such individuals were required to work for less than minimum wage and were not paid time and one-half when working in excess of forty (40) hours per week. Additionally, such individuals were not provided spread-of-hours

premiums while working shifts in excess of ten (10) hours, nor were they provided with proper wage notices at hiring, by February 1 of each year, or proper wage statements with their wage payments on a weekly basis.

104.    Upon information and belief, throughout the Class Period and continuing until today, Defendants failed to maintain accurate and sufficient time and payroll records or provide such records to employees.

105.    Upon information and belief, throughout the Class Period and continuing until today, defendants failed to post or keep posted notices explaining the minimum wage and overtime pay rights provided by the FLSA or New York Labor Law.

**FIRST CAUSE OF ACTION**
**FAIR LABOR STANDARDS ACT – UNPAID MINIMUM WAGE**
**(Brought on Behalf of Plaintiffs and the Collective Action Members)**

106.    Plaintiffs, on behalf of themselves and the Collective Action Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

107.    By failing to pay minimum wage for all hours worked, Defendants have violated and continue to violate the FLSA, 29 U.S.C. §§ 201 *et seq.*, including 29 U.S.C. §§ 206 and 215(a)(2).

108.    The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

109.    Defendants' failure to pay minimum wages for all hours worked caused Plaintiffs and the Collective Action Members to suffer loss of wages and interest thereon.  By failing to pay Plaintiffs and the Collective Action Members the tipped minimum wage for all hours worked, Defendants lose the ability to utilize a tip credit against the FLSA's minimum wage.  Therefore,

Plaintiffs and the Collective Action Members are entitled to recover from Defendants their full unpaid minimum wages, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to 29 U.S.C. § 216(b).

## SECOND CAUSE OF ACTION
## FAIR LABOR STANDARDS ACT – UNPAID OVERTIME
**(Brought on Behalf of Plaintiffs and the Collective Action Members)**

110.    Plaintiffs, on behalf of themselves and the Collective Action Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

111.    By failing to pay overtime at a rate not less than one and one-half times the regular rate of pay for work performed in excess of 40 hours per week, Defendants have violated and continue to violate the FLSA, 29 U.S.C. §§ 201 *et seq.*, including 29 U.S.C. §§ 207(a)(1) and 215(a)(2).

112.    The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

113.    Defendants' failure to pay overtime caused Plaintiffs and the Collective Action Members to suffer loss of wages and interest thereon. Plaintiffs and the Collective Action Members are entitled to recover from Defendants their unpaid overtime premium compensation, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to 29 U.S.C. § 216(b).

## THIRD CAUSE OF ACTION
## NEW YORK LABOR LAW – UNPAID MINIMUM WAGE
**(Brought on Behalf of Plaintiffs and the Class Members)**

114.     Plaintiffs, on behalf of themselves and the Class Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

115.     Defendants willfully violated Plaintiffs' and Class Members' rights by failing to pay minimum wage for all hours worked, in violation of the NYLL and regulations promulgated thereunder.

116.     Defendants' failure to pay minimum wage for all hours worked caused Plaintiffs and the Class Members to suffer loss of wages and interest thereon.  Plaintiffs and the Class Members are entitled to recover from Defendants their unpaid minimum wages, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to NYLL §§ 663(1) *et seq.*

**FOURTH CAUSE OF ACTION**
**NEW YORK LABOR LAW – UNPAID OVERTIME**
**(Brought on Behalf of Plaintiffs and the Class Members)**

117.     Plaintiffs, on behalf of themselves and the Class Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

118.     Defendants willfully violated Plaintiffs' and the Class Members' rights by failing to pay overtime compensation at a rate of not less than one and one-half times the regular rate of pay for hours worked in excess of 40 each week, in violation of the NYLL and regulations promulgated thereunder.

119.     Defendants' failure to pay overtime premium compensation caused Plaintiff and the Class Members to suffer loss of wages and interest thereon.  Plaintiffs and the Class Members are entitled to recover from Defendants their unpaid overtime compensation, damages for

unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to NYLL §§ 663(1) *et seq.*

### FIFTH CAUSE OF ACTION
### NEW YORK LABOR LAW – UNPAID SPREAD-OF-HOURS PREMIUMS
### (Brought on Behalf of Plaintiffs and the Class Members)

120.    Plaintiffs, on behalf of himself and the Class Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

121.    Defendants willfully violated Plaintiffs' and the Class Members' rights by failing to pay compensation in an amount equal to one hour's pay at the relevant minimum wage in all instances where the Class Members worked either a split shift or more than 10 hours per day, in violation of the NYLL §§ 650, *et seq.*, and the regulations promulgated thereunder including N.Y. Comp. Code R. & Regs. tit. 12, §§ 137-1.7 (2010), 146-1.6 (2012).

122.    Defendants' failure to pay spread-of-hours compensation caused Plaintiffs and the Class Members to suffer loss of wages and interest thereon.  Plaintiffs and the Class Members are entitled to recover from Defendants their unpaid spread-of-hours compensation, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees and costs and disbursements of the action pursuant to NYLL §§ 663(1) *et seq.*

### SIXTH CAUSE OF ACTION
### NEW YORK LABOR LAW – FAILURE TO PROVIDE WAGE NOTICE
### (Brought on Behalf of Plaintiffs and the Class Members)

123.    Plaintiffs, on behalf of themselves and the Class Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

124.    Defendants have willfully failed to supply Plaintiffs and the Class Members notice as required by Article 6, § 195, in English or in the language identified by Plaintiffs and the Class Members as their primary language, containing Plaintiffs' and Class Members' rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; hourly rate or rates of pay and overtime rate or rates of pay, if applicable;  the regular pay day designated by the employer in accordance with the NYLL, Article 6, § 191; the name of the employer; or any "doing business as" names used by the employer' the physical address of the employer's main office or principal place of business, and a mailing address if different; the telephone number of the employer; plus such other information as the commissioner deems material and necessary.

125.    Due to Defendants' violations of the NYLL, Plaintiffs and the Class Members are entitled to recover from Defendants fifty dollars ($50.00) per employee for each workweek that the violations occurred or continue to occur, up to a maximum of twenty-five hundred dollars ($2,500.00) per employee, as provided for by NYLL, Article 6, §§ 190, *et seq*., liquidated damages as provided for by the NYLL, reasonable attorneys' fees, costs, pre-judgment and post-judgment interest, and injunctive and declaratory relief.

**SEVENTH CAUSE OF ACTION**
**NEW YORK LABOR LAW – FAILURE TO PROVIDE WAGE STATEMENT**
**(Brought on Behalf of Plaintiffs and the Class Members)**

126.    Plaintiffs, on behalf of themselves and the Class Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

127.    Defendants have willfully failed to supply Plaintiffs and Class Members with an accurate statement of wages as required by NYLL, Article 6, § 195, containing the dates of work

covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; hourly rate or rates of pay and overtime rate or rates of pay if applicable; the number of hours worked, including overtime hours worked if applicable; deductions; and net wages.

128.    Due to Defendants' violations of the NYLL, Plaintiffs and the Class Members are entitled to recover from Defendants one hundred dollars ($100) per employee for each workweek that the violations occurred or continue to occur, up to a maximum of twenty-five hundred dollars ($2,500) per employee, as provided for by NYLL, Article 6, §§ 190 *et seq.*, liquidated damages as provided for by the NYLL, reasonable attorneys' fees, costs, pre-judgment and post-judgment interest, and injunctive and declaratory relief.

**EIGHTH CAUSE OF ACTION**
**NEW YORK LABOR LAW – UNREIMBURSED BUSINESS EXPENSES**
**(Brought on Behalf of Plaintiffs and the Class Members)**

129.    Plaintiffs, on behalf of themselves and the Class Members, repeat, reallege and incorporate by reference the foregoing allegations as if set forth fully and again herein.

130.    Defendants often paid Plaintiffs and Class Members in paycheck or business check without having sufficient funds in their bank account.  As a result, the checks would bounce, and Plaintiffs and Class Members would incur a fee through their bank. Defendants failed to reimburse Plaintiffs for the bounced check fees. Accordingly, Defendants are required to compensate Plaintiffs for all business expenses that Defendants required Plaintiffs to incur without reimbursement.

131.    The Defendants' NYLL violations have caused Plaintiffs and the Class Members irreparable harm for which there is no adequate remedy at law.

132.    Due to Defendants' NYLL violations, Plaintiffs and the York Class Members are entitled to recover damages from Defendants in the amount of Defendants' unreimbursed business expenses for which Plaintiffs and the New York Class Members incurred, plus liquidated damages, damages for unreasonably delayed payment of wages, interest, reasonable attorneys' fees and costs and disbursements of the action pursuant to NYLL § 663(1) *et seq.* and § 196-d.

**NINTH CAUSE OF ACTION**
**NEW YORK LABOR LAW – UNLAWFUL WITHHOLDING OF GRATUITIES**
**(Brought on Behalf of Plaintiffs and the Class Members)**

129.    Plaintiffs, on behalf of themselves and the Class Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

130.    Defendants have willfully failed to compensate Plaintiffs and the Class Members for all gratuities earned by withholding a portion of gratuities left by patrons for Plaintiffs and the Class Members, in violation of § 196-d of the New York Labor Law. Accordingly, Defendants are required to compensate Plaintiff and the Class Members for all gratuities withheld by Defendants.

131.    Due to the Defendants' New York Labor Law violations, Plaintiffs and the Class Members are entitled to recover from Defendants their unpaid gratuities, damages for unreasonably delayed payment of wages liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to NYLL §§ 663(1) *et al.*, 196-d.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs, on behalf of themselves and all other similarly situated Collective Action Members and Class Members, respectfully request that this Court grant the following relief:

a.    Designation of this action as a collective action on behalf of the Collective Action Members and ordering the prompt issuance of notice pursuant to 29 U.S.C. § 216(b)

to all similarly situated members of an FLSA Opt-In Class, apprising them of the pendency of this action, permitting them to assert timely FLSA claims in this action by filing individual Consents to Sue pursuant to 29 U.S.C. § 216(b) and appointing Plaintiff and his counsel to represent the Collective Action Members;

b.      Certification of this action as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2) and (b)(3) on behalf of the Class Members and appointing Plaintiffs and their counsel to represent the Class;

c.      An order tolling the statute of limitations;

d.      A declaratory judgment that the practices complained of herein are unlawful under the FLSA and the NYLL;

e.      An injunction against Defendants and its officers, agents, successors, employees, representatives and any and all persons acting in concert with Defendants, as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

f.      An award of compensatory damages as a result of Defendants' failure to pay minimum wage and overtime compensation pursuant to the FLSA and the NYLL and supporting regulations;

g.      An award of liquidated and/or punitive damages as a result of the Defendants' willful failure to pay minimum wages and overtime compensation pursuant to the FLSA and the NYLL and supporting regulations;

h.      An award of actual and liquidated damages for the non-payment of spread-of-hours pay for each split shift and/or shift worked in New York in excess of ten (10) hours;

i.        An award of compensatory and liquidated damages as a result of Defendants' willful failure to pay all gratuities earned by Plaintiffs and the Opt-In Plaintiffs;

j.        An award of damages arising out of unreimbursed business expenses;

k.       An award of liquidated damages arising out of unreimbursed business expenses;

l.        Fifty dollars ($50.00) per Plaintiff and each of the Class Members for each workweek that the violations of NYLL, Article 6 § 195 occurred or continue to occur, up to a maximum of twenty-five hundred dollars ($2,500.00) per Plaintiff and each of the Class Members as provided for by NYLL, Article 6 § 198(1)-b.

m.     One hundred dollars ($100.00) per Plaintiff and each of the Class Members for each workweek that the violations of NYLL, Article 6 § 195 occurred or continue to occur, up to a maximum of twenty-five hundred dollars per Plaintiff and each of the Class Members as provided for by NYLL, Article 6 § 198(1)-d;

n.       An award of damages arising out of the non-payment of gratuities;

o.       An award of liquidated damages arising out of the non-payment of gratuities;

p.       An award of prejudgment and post-judgment interest;

q.       An award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

r.        Such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all questions of fact raised by the complaint.

Dated: New York, New York
         July 14, 2017

Respectfully submitted,

**PELTON GRAHAM LLC**

By: _____

Brent E. Pelton (BP 1055)
Pelton@PeltonGraham.com
Taylor B. Graham (TG 9607)
Graham@PeltonGraham.com
111 Broadway, Suite 1503
New York, New York 10006
Telephone: (212) 385-9700
Facsimile: (212) 385-0800

*Attorneys for Plaintiffs, the putative FLSA Collective
and Class*

## CONSENT TO BECOME PARTY PLAINTIFF

By my signature below, I hereby authorize the filing and prosecution of claims in my name and on my behalf to contest the failure of Ethos Gallery 51, LLC, 75 HA Restaurant LLC, Little West Restaurant LLC and/or their respective owners, affiliated companies, subsidiaries, contractors, directors, officers, franchisees and/or affiliates to pay me minimum wages and overtime wages as required under state and/or federal law, and also authorize the filing of this consent in the action(s) challenging such conduct. I authorize being **named as the representative plaintiff** in this action to make decisions on behalf of all other plaintiffs concerning the litigation, the method and manner of conducting this litigation, the entering of an agreement with Plaintiff's counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit. I understand that I will be represented by Pelton Graham LLC without prepayment of costs or attorneys' fees. I understand that if plaintiffs are successful, costs expended by attorneys on my behalf will be deducted from my settlement or judgment first. I understand that my attorneys may petition the court for an award of fees and costs to be paid by defendants on my behalf. I understand that the fees retained by the attorneys will be either the amount received from the defendants or approximately 1/3 (33.33%) of my total settlement or judgment amount (including fees), whichever is greater.


_____          _____
Signature                                                    Printed Name