# PELTON GRAHAM LLC

111 BROADWAY, SUITE 1503, NEW YORK, NEW YORK 10006
T 212.385.9700 ‖ F 212.385.0800 ‖ WWW.PELTONGRAHAM.COM

**BRENT E. PELTON, ESQ.**                                                                                  AUGUST 30, 2019
PELTON@PELTONGRAHAM.COM

**VIA ECF**

Honorable Gregory H. Woods
United States District Court
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 2260
New York, NY 10007

> Re: *Legantis, et al. v. Ethos Gallery 51, LLC, et al.*, 16 Civ. 8198 (GHW)
> *Ahemetasevic, et al. v. Ethos Gallery 51, LLC, et al.*, 17 Civ. 01167 (GHW)
> **Joint FLSA Settlement Fairness Letter**

Dear Judge Woods:

      This office represents named plaintiffs Mehmed Ahmetasevic, Mirza Ahmetasevic and Alex Petrovski (collectively, the "Ahmetasevic Named Plaintiffs") and opt-in plaintiffs Katerina Miltiadou, Bilyana Petrova, Jung Hee Seo and Khasru Choudhury (collectively, the "Ahmetasevic Opt-in Plaintiffs" and, together with the Ahmetasevic Named Plaintiffs, the "Ahmetasevic Plaintiffs"). We write, jointly with Anastasi Pardalis, Esq., counsel for Plaintiffs in the consolidated matter, *Legantis, et al. v. Ethos Gallery 51, et al.*, Civil Action No. 16-cv-8198, and Mitchell Segal, Esq., counsel for Defendants, pursuant to the Fair Labor Standards Act ("FLSA"), the Second Circuit's decision in *Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199, 206 (2d Cir. 2015) and the Court's instructions during the August 23, 2019 telephone conference. Counsel for the parties respectfully submit that the attached negotiated Settlement Agreement (Exhibit A) constitutes a fair and reasonable compromise of this matter which should be approved by the Court.[1]

## I. Procedural History and Plaintiffs' Allegations

      Plaintiffs Ioannis Legantis and Nikolaos Papageorgiou (together, the "Legantis Named Plaintiffs") commenced the *Legantis* matter on October 19, 2016 by filing a Class and Collective Action Complaint against Defendants Ethos Gallery 51, LLC ("Ethos Gallery 51"), Old Northern Boulevard Restaurant LLC ("Kyma Restaurant"), Little West Restaurant LLC ("Pathos Café"), 75 HA Restaurant LLC ("The BBG"), Ioannis Chatiris ("Chatiris") and Christos Panagiotopoulos

---

[1] The attached agreement has been agreed to by all parties. The parties will submit the fully executed agreement to the Court as soon as we are able to obtain all signatures.

–« ADVOCATES FOR JUSTICE »–

("Panagiotopoulos"), alleging unpaid minimum wages and unpaid overtime premiums, pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.* and New York Labor Law ("NYLL"), §§ 650 *et seq.*, as well as unlawful misappropriation of gratuities, unpaid spread-of-hours premiums, and wage notice, wage statement and meal break violations under the NYLL. (*See Legantis*, Dkt. No. 1). William Cusack, III, Esq., Lakisha Marie Spence, Esq., Alexandra Manfredi, Esq. and Justin Guilfoyle, Esq. filed their notices of appearance on behalf of Kyma Restaurant on November 17, 2016, December 13, 2016, May 18, 2017 and November 1, 2017, respectively. (*Lengatis*, Dkt. Nos. 11, 18, 58, 73). Arthur Forman, Esq. filed his notice of appearance on behalf of Ethos Gallery 51, Pathos Café, The BBG, Chatiris and Panagiotopoulos on January 10, 2017. (*Legantis*, Dkt. No. 22).

Plaintiffs Roberto Kliggopoulos, Dimitris Pahoulis, Vasilis Gongos, Ols Nasti, Marco Sanchez, Luis Carretero, Juliette Gjika, Johnny Singetary and Nicholas Giannikos subsequently exercised their right to join the *Legantis* action by filing a consent to become a party plaintiff form with the Court. (*Legantis*, Dkt. Nos. 4-9, 15, 37-38).

On December 21, 2016, counsel for the *Legantis* Plaintiffs filed their First Amended Complaint, adding certain allegations that Defendants are joint employers of Plaintiffs who operated as a single integrated enterprise. (*Legantis*, Dkt. No. 27). Defendants Ethos Gallery 51, Pathos Café, The BBG, Chatiris and Panagiotopoulos filed their Answer to the *Legantis* Plaintiffs' First Amended Complaint on January 10, 2017, denying all material allegations. (*Legantis*, Dkt. No. 32).

Defendant Kyma Restaurant filed a motion to dismiss the *Legantis* Plaintiffs' First Amended Complaint on February 22, 2017, which the Court denied on April 12, 2017. (*Legantis*, Dkt. Nos. 39-40, 49). Defendant Kyma Restaurant subsequently filed its Answer to the *Legantis* Plaintiffs' First Amended Complaint on May 10, 2017, denying all material allegations. (*Legantis*, Dkt. No. 53).

Plaintiffs Mehmed Ahmetasevic and Alex Petrovski filed their Class & Collective Action Complaint against Ethos Gallery 51, Pathos Café, The BBG, Chatiris and Panagiotopoulos on February 15, 2017, alleging unpaid minimum wages and unpaid overtime premiums, pursuant to the FLSA, as well as unpaid spread-of-hours premiums, unpaid gratuities and wage notice and wage statement violations under the NYLL. (*See Ahmetasevic*, Dkt. No. 1). The *Ahmetasevic* and *Legantis* cases were accepted by the Court as related matters on February 21, 2017. Plaintiffs Katerina Miltiadou, Bilyana Petrova, Jung Hee Seo and Khasru Choudhury subsequently exercised their right to join the *Ahmetasevic* matter by filing a consent to become a party plaintiff form with the Court. (*Ahmetasevic*, Dkt. Nos. 32, 42, 43, 64).

On March 22, 2017, a group of nine (9) back-of-the-house employees represented by Michael Faillace & Associates, P.C. filed a third action against Ethos Gallery 51, Pathos Café, Chatiris and Panagiotopoulos. (*See Torres, et al. v. Ethos Gallery 51 LLC, et al.*, Civil Action No. 17-cv-02064). The case was accepted as related to the *Ahmetasevic* matter on March 24, 2017. On September 21, 2018, Michael Faillace & Associates, P.C. subsequently filed another near-identical case against the same defendants on behalf of a single plaintiff, Javier Hernandez. (*See Hernandez*

*v. Ethos Gallery 51 LLC, et al.*, Civil Action No. 18-cv-08675). The Court accepted the *Hernandez* case as related to the *Torres* matter on September 24, 2018.

On May 16, 2017, Mr. Segal filed a notice of substitution of attorney in the *Legantis* matter, thus taking over the representation of Ethos Gallery 51, Pathos Café, The BBG, Chatiris and Panagiotopoulos from Mr. Forman. (*Legantis*, Dkt. No. 54). Mr. Segal subsequently filed his notice of appearance in the *Ahmetasevic* matter on June 6, 2017. (*Ahmetasevic*, Dkt. No. 29). Defendants Ethos Gallery 51, Pathos Café, The BBG, Chatiris and Panagiotopoulos filed their Answer to the *Ahmetasevic* Plaintiffs' Complaint on June 30, 2017, denying all material allegations. (*Ahmetasevic*, Dkt. No. 35).

On June 29, 2017, Mr. Segal filed a letter requesting a pre-motion conference regarding Defendants' anticipated motion to dismiss based on lack of personal jurisdiction over Defendants Chatiris and Panagiotopoulos, whom Defendants alleged Plaintiffs had failed to timely serve within the ninety (90)- day period prescribed by Rule 4(m) of the Federal Rules of Civil Procedure ("FRCP"). (*Ahmetasevic*, Dkt. No. 34). The *Ahmetasevic* Plaintiffs filed a letter in opposition on July 5, 2017, explaining that Mr. Foreman, formerly Plaintiffs' counsel in the related *Legantis* matter, had repeatedly informed counsel for the *Ahmetasevic* Plaintiffs, that he would likely be retained and accept service of Plaintiffs' Complaint on behalf of all Defendants. (Ahmetasevc, Dkt. No. 36). On July 11, 2017, Your Honor subsequently directed the *Ahmetasevic* Plaintiffs to show cause as to why Chatiris and Panagiotopoulos should not be dismissed for failure to effectuate timely service. (*Ahmetasevic*, Dkt. No. 40). On July 21, 2017, counsel for the *Ahmetasevic* Plaintiffs filed a letter to the Court, arguing that Defendant Panagiotopoulos, whom Mr. Segal had previously stated resides in Greece and derives a large portion of his income from a construction and development company that he owns in Greece, is a foreign resident subject to FRCP 4(f), which exempts service in a foreign country from the normal requirement that a summons and complaint be served within ninety (90) days after commencing an action. (*Ahmetasevic*, Dkt. No. 47). On July 14, 2017, counsel for the *Ahmetasevic* Plaintiffs filed an Amended Class & Collective Action Complaint, adding Mirza Ahmetasevic as a named plaintiff, as well as a claim for unreimbursed business expenses based on Defendants' alleged failure to reimburse Plaintiffs for bank fees resulting from bounced checks. (*Ahmetasevic*, Dkt. No. 41).

The parties in the *Legantis* and *Ahmetasevic* matters appeared before Your Honor for an initial conference on July 27, 2017, wherein the parties discussed a discovery schedule. During this conference, the Court granted the *Ahmetasevic* Plaintiffs an additional forty-five (45) days to effectuate service on Defendants Chatiris and Panagiotopoulos. (*Ahmetasevic*, Dkt. No. 49, *Legantis* Dkt. No. 64). The Court subsequently extended Plaintiffs' deadline to serve Panagiotopous to November 9, 2017. (*Ahmetasevic*, Dkt. No. 60). The *Ahmetasevic* Plaintiffs served Defendants Chatiris and Panagiotopoulos at Ethos Gallery 51, located at 905 1st Avenue, New York, New York 10022, on August 18, 2017. (*Ahmetasevic*, Dkt. Nos. 56-57). Plaintiffs additionally served Defendant Panagiotopoulos at his business in Greece on October 25, 2017. (*Ahmetasevic*, Dkt. No 76).

On October 19, 2017, counsel for the *Legantis* and *Ahmetasevic* matters filed a joint motion to consolidate the two matters, which the Court granted on November 30, 2017. (*Ahmetasevic*,

Dkt. Nos. 65-68, 79; *Legantis* Dkt. Nos. 77-80, 83). On January 5, 2018, Plaintiffs filed their consolidated complaint against Defendants Ethos Gallery 51, Pathos Café, The BBG, Chatiris and Panagiotopoulos. (*Legantis*, Dkt. No. 86). Mr. Segal filed his Answer to Plaintiffs' consolidated complaint on January 16, 2018, denying all material allegations. (*Legantis*, Dkt. No. 87; *Ahmetasevic*, Dkt. No. 80).

On January 24, 2018, counsel for the *Legantis*, *Ahmetasevic* and *Torres* matters informed the Court in a joint status letter that the *Legantis* Plaintiffs had reached a settlement in principle with Defendant Kyma Restaurant. (*Legantis*, Dkt. No. 88; *Ahmetasevic*, Dkt. No. 81). The parties additionally requested that the three (3) cases be referred to the SDNY Mediation Program, which the Court granted on February 14, 2018. (*Legantis*, Dkt. No. 91). On March 14, 2018, the *Legantis* Plaintiffs filed their settlement agreement with Defendant Kyma Restaurant, which the Court granted on July 13, 2018 after the *Legantis* Plaintiffs revised the agreement pursuant to the Court's instructions, thereby dismissing Defendant Kyma Restaurant from the *Legantis* matter. (*Legantis*, Dkt. Nos. 95, 98-99, 102-103). Excepting Defendant Kyma Restaurant, the parties in the *Legantis*, *Ahmetasevic* and *Torres* matters participated in a full-day mediation on May 10, 2018 with Robert Kheel, Esq. of the SDNY Mediation Program, during which the parties were unable to reach a resolution.

Throughout the litigation, the parties completed significant written and deposition discovery. On July 6, 2017, counsel for the *Legantis* Plaintiffs served their first set of interrogatories and document demands on Defendants Ethos Gallery 51, Pathos Café, The BBG, Chatiris and Panagiotopoulos. Counsel for the *Ahmetasevic* Plaintiffs served their first set of interrogatories and document demands on these same Defendants on September 1, 2017. Plaintiffs additionally served supplemental document demands upon Defendants on January 12, 2018 after learning during the deposition of Defendant Panagiotopoulos that Panagiotopoulos had certain e-mail and text message communications that were not previously disclosed to Plaintiffs. In response to Plaintiffs' demands, Defendants produced certain liquor license application documents, check stubs, company checks, time cards, e-mails, an operating agreement signed by Defendants Chatiris and Panagiotopoulos, and certain tax documents. Prior to the close of discovery, Plaintiffs produced certain paystubs, company checks, e-mails, text messages, booklets allegedly containing the tip amounts Defendants' employees earned during various shifts, extracts of a personal diary of Plaintiff Gongos noting his hours of work and daily tips, certain 2014 payroll reports, business cards, certain clock-in and clock-out records and a voicemail recording from Defendant Panagiotopoulos to Plaintiff Petrova. Plaintiffs took the depositions of Defendants Chatiris and Panagiotopoulos on November 29, 2017 and January 10, 2018, respectively. At no point did Defendants serve discovery demands upon Plaintiffs or request to take their depositions.

On February 28, 2019, Plaintiffs filed a letter informing the Court that they did not intend to move for summary judgment on any issue. (*Legantis*, Dkt. No. 93). Following the initial mediation session, the parties continued to engage in settlement discussions, ultimately reaching a settlement in principle on or about June 11, 2019. The parties informed the Court that they had reached a resolution during a telephone conference on August 13, 2019. A trial in all four (4) matters is currently scheduled for October 28, 2019.

## II. The Settlement Accounts for Litigation Risk

Throughout this litigation, the parties have held significantly different viewpoints on the underlying facts of this matter and Defendants' potential liability. Fundamentally, the parties dispute the number of hours that Plaintiffs worked and the manner in which they were paid. Plaintiffs allege that they worked as servers, bussers, expediters, bartenders, runners, baristas, cooks and cleaners at Ethos Gallery 51, Pathos Café and The BBG throughout the relevant time period. Throughout their respective employment periods, Plaintiffs allege that they typically worked between twenty-seven (27) and sixty (60) hours per week, and sometimes more. Plaintiffs who worked in tipped positions allege that for at least a portion of their respective employment periods, if not the duration of their employment with Defendants, they derived their entire income from customers' tips, which they received in cash or on a business check, such that they did not receive payment for wages of any kind. Those tipped employees who, at some point during their employment periods, received a payroll check allege that they were generally paid the tipped minimum wage of five dollars ($5.00) or seven dollars and fifty cents ($7.50) per hour for all hours for which they received compensation. Certain Plaintiffs, including Mehmed Ahmetasevic, Mirza Ahmetasevic and Alex Petrovski additionally allege that, at times, they would typically not be paid wages of any kind for time worked above a certain number of hours per week, such that there were frequently hours missing from their payments. Plaintiffs Mehmed Ahmetasevic, Mirza Ahmetasevic and Petrovski additionally allege that they received a flat weekly salary of between one thousand one hundred dollars ($1,100.00) and one thousand five hundred dollars ($1,500.00) per week that did not increase with the number of hours that they worked during certain portions of their employment with Defendants. Plaintiff Petrovski alleges that for the first seven to eight (7-8) months of his employment, when he worked as a busser, he was paid a flat rate of fifty dollars ($50.00) for a lunch shift and one hundred dollars ($100.00) for a dinner shift, entirely in cash.

Plaintiffs allege that for the majority of the relevant time period, Defendants did not maintain a formal timekeeping system of any kind at any of their restaurants and that even after Defendants implemented a time clock in their restaurants in or around fall 2016, Defendants would frequently edit employees' clock-in and clock-out times such that there would generally be several hours missing from their payment each week.

Plaintiffs who worked in tipped positions further allege that Defendant Chatiris and other non-tipped managers unlawfully took part in the tip pool, whereby servers, bussers, runners and other tipped employees would input the tips they received from customers. Plaintiffs also claim that Defendants would routinely retain a portion of the tips to which employees who worked large private events at Defendants' restaurants were entitled.

Plaintiffs Giannikos, Nasti, Sanchez and Carretero, who worked as cooks, and Singletary, who worked as a cleaner, allege that they were paid a flat weekly salary of between five hundred dollars ($500.00) and one thousand one hundred dollars ($1,100.00) throughout their respective employment periods that did not increase with the number of hours that they worked, such that they did not receive overtime premiums of one and one-half (1.5) times their regular hourly rates when they worked as many as sixty to eighty (60-80) hours per week.

Throughout the litigation, Defendants have vigorously denied Plaintiffs' allegations in their entirety. Perhaps most significantly, Defendants argue that the tipped plaintiffs consistently received an hourly wage and that they did not work additional time in excess of the number of hours for which they were compensated. Defendants additionally allege that they were able to keep track of the hours that the tipped plaintiffs worked through the restaurants' P.O.S. system from in or around 2012 or 2013. Across the board, Defendants deny the number of hours that Plaintiffs claim to have worked, particularly during the winter months, when the restaurant was considerably less busy. Specifically, Defendants argue that Plaintiffs generally did not work in excess of between forty (40) and fifty (50) hours per week and that Plaintiffs never worked in excess of ten (10) hours per day, because there was a two (2)-hour break period between the end of the lunch shift and the beginning of the dinner shift. Defendants additionally allege that the tipped employees distributed the tips amongst themselves such that managers would not have had an opportunity to take money from the pool. Defendants deny that they or any of their managers manually altered employees' clock-in and clock-out times for any reason other than to correct a missed punch after discussing the error with the employee.

Defendants additionally argue that Plaintiffs Mirza Ahmetasevic and Alex Petrovski were exempt managers for certain portions of their respective employment periods such that they would not be entitled to overtime premiums for their work. Although Mirza Ahmetasevic was ostensibly employed and accounted for as a "manager" whose job duties included speaking with vendors, helping to operate the restaurant and organizing events at the restaurant from in or around September 2016 through mid-June 2017, Plaintiffs allege that Mirza did not have the power to hire or fire employees or otherwise set the terms of others' employment. Mirza Ahmetasevic further alleges that he spoke with Defendant Panagiotopoulos on a near-daily basis about the operations of the restaurant during the period that he was classified as a "manager" and had to receive approval before moving forward with supply orders or wine deals. Similarly, although Defendants referred to Plaintiff Petrovski as a "kitchen manager" during approximately the last five (5) months of his employment, Petrovski alleges that he primarily worked as an expediter during this period.

Defendants have also vigorously denied that Defendant Panagiotopoulos was liable to Plaintiffs as their "employer" under the FLSA and NYLL. Specifically, Defendants allege that Panagiotopoulos lives in Greece full time, is a Greek citizen and comes to the United States only a couple of times per year. Defendants allege that Panagiotopoulos is a passive investor who derives his income primarily from a construction and development company that he owns in Greece such that he has no involvement in the management, operations and policies of the restaurants. Plaintiffs argue that although Panagiotopoulos was not present at the restaurants on a day-to-day basis, he had overall operational control over the restaurants and their employment policies and had veto power over all of Chatiris's decisions, pursuant to an operating agreement between Chatiris and Panagiotopoulos. It is Plaintiffs' assertion that Chatiris and Plaintiffs frequently sent information relating to payroll, including employee hours, and orders for food and other supplies to Panagiotopoulos via e-mail and text for approval.

As mentioned above, Defendants produced 2016 and 2017 time cards showing the times that certain plaintiffs allegedly clocked in and out of Defendants' restaurants. Although Defendants

produced certain check stubs and company checks, it is not clear from these documents the precise number of hours that Plaintiffs worked during the applicable pay period. Further, Defendant Chatiris stated during his deposition that certain of the restaurants' computers were damaged, such that Defendants may not have time records dating back before November or December 2015 and that he typically threw away records after a year or two. Because Defendants have not produced records showing the total number of hours that Plaintiffs worked throughout the relevant time period, Plaintiffs would be able to rely on their testimony as to the extent of their work as a matter of just and reasonable inference. Further, in the absence of complete records showing the distribution of tips, Plaintiffs recognize that their unpaid gratuities claims (i.e., that Defendant Chatiris and other non-tipped managers misappropriated tips from the tip pool and did not distribute the correct amount of tips to employees who worked private events) may be difficult to quantify and prove. While Plaintiffs believe that a factfinder would credit their testimony over that of the Defendants, Plaintiffs recognize that the lack of documents demonstrating the hours that they worked could potentially limit the amount of damages they could recover at trial regarding their minimum wage, overtime, spread-of-hours and unpaid gratuities claims if a factfinder credited Defendants' testimony in its entirety.

Due to the fact-intensive nature of the Plaintiffs' claims, it is likely that substantive answers to these disputed issues would not be resolved until after trial. Based on these disputes, the parties engaged in good-faith, arm's-length settlement negotiations regarding not only Plaintiffs' FLSA claims, but also their pendent state law claims.[2]

In advance of the May 10, 2018 mediation, Plaintiffs' counsel in the *Legantis* and *Ahmetasevic* matters created individual damages analyses based on Plaintiffs' best estimates of the hours that they worked and the wages that they were paid and certain paystubs and check stubs in Plaintiffs' and Defendants' document production, which they periodically revised over the course of settlement discussions as they learned new information. Plaintiffs' final damages analysis resulted in $470,228.46 in unpaid minimum wages (including $180,264.00 for the *Legantis* Plaintiffs and $289,964.46 for the *Ahmetasevic* Plaintiffs), $270,882.45 in unpaid overtime wages (including $151,175.98 for the *Legantis* Plaintiffs and $119,706.47 for the *Ahmetasevic* Plaintiffs) and in unpaid spread-of-hours premiums (including $47,177.50 for the *Legantis* Plaintiffs and $31,573.86 for the *Ahmetasevic* Plaintiffs).[3] When Plaintiffs' damages for unreimbursed business expenses, wage notice and wage statement violations, as well as liquidated damages under the FLSA and NYLL and statutory interest on the NYLL claims at 9% per annum were added to Plaintiffs' "actual" wage damages, the total alleged damages came out to $2,063,467.58 (including $1,045,701.86 for the *Legantis* Plaintiffs and $1,017,765.72 for the *Ahmetasevic* Plaintiffs).

Specifically, for portions of the tipped plaintiffs' employment periods during which they allege that they did not receive wages of any kind but were paid only from customers' tips, Plaintiffs calculated unpaid minimum wage damages by multiplying the number of hours that

---

[2] Such claims, of course, may be waived by private agreement. *Amaya v. Garden City Irrigation, Inc.*, 2011 U.S. Dist. LEXIS 15316, at *4-5 (E.D.N.Y. Feb. 15, 2011).

[3] While Plaintiffs alleged in their respective complaints that Defendants illegally retained gratuities left by customers and failed to pay all such gratuities to Plaintiffs, prior to the May 10, 2018, Plaintiffs ultimately agreed not to include alleged unpaid tips in settlement discussions, as they assigned minimal value to the claim.

Plaintiffs worked each week by the full statutory minimum wage in effect. Because Plaintiffs allege that Defendants did not provide them with proper notice that Defendants were taking the tip credit in calculating their hourly rate, for portions of the tipped plaintiffs' employment periods that which they received payroll checks showing payment for certain hours worked at the tipped minimum wage rate, Plaintiffs calculated unpaid minimum wage damages by multiplying the differential between Plaintiffs' hourly rate and the full minimum wage in effect at the time by the number of hours that Plaintiffs claim to have worked. Similarly, for portions of the tipped plaintiffs' employment periods during which they allege that they only received tips, Plaintiffs multiplied the number of hours that they worked in excess of forty (40) in a week by one and one-half (1.5) times the full statutory minimum wage. For periods when the tipped employees allege that they received paystubs, Plaintiffs calculated unpaid overtime damages by multiplying the difference between one and one-half (1.5) times the full minimum wage rate and one and one-half (1.5) times the tipped minimum wage rate by the number of hours for which Plaintiffs were compensated in excess of forty (40). For periods when Plaintiffs allege that Defendants shaved certain hours from their payments, Plaintiffs additionally multiplied the number of alleged missing hours by one and one-half (1.5) times the full statutory minimum wage rate in effect at the time.

For back-of-the-house employees who were paid a fixed weekly salary, and for the portions of Mehmed Ahmetasevic, Mirza Ahmetasevic and Alex Petrovski's employment periods that they were paid on a salary basis, Plaintiffs calculated unpaid overtime by multiplying Plaintiffs' hourly rate of pay (converted from their respective weekly salaries), or the minimum wage in effect at the time, whichever was higher, by one-half (0.5) for all hours worked above forty (40) per week.

For each day that Plaintiffs claim to have worked shifts in excess of ten (10) hours, Plaintiffs calculated unpaid spread-of-hours premiums by multiplying one (1) hour of the applicable minimum wage.

As mentioned above, Defendants argue that the tipped plaintiffs received an hourly rate throughout their respective employment periods for all hours that they worked and that they received overtime premiums for all hours worked in excess of forty (40) in a week. Defendants vehemently deny Plaintiffs' allegations regarding shaved hours and maintain that Plaintiffs were properly compensated for all hours that they worked. Defendants additionally argue that Plaintiffs never worked in excess of ten (10) hours in a day due to a lengthy break between the restaurants' lunch and dinner shifts, such that they would not have been entitled to spread-of-hours premiums. Finally, Defendants deny that they or any of their managers or supervisors ever took customers' tips and assert that the tipped employees were in charge of distributing the tips amongst themselves at the end of the night.

Given the above, the settlement amount (i.e., $810,000.00) represents a substantial recovery of the actual unpaid wages calculated from the Plaintiffs' analysis, which would be the anticipated recovery if Plaintiffs had received a favorable outcome at trial under both federal and state law. While it does not compensate Plaintiffs for all of their liquidated damages, penalties, and attorneys' fees in addition to the damages, the parties believe that this is a fair recovery based on the risks associated with establishing the calculated damages and the risks associated with proceeding to trial.

In light of the significant litigation risks outlined above, the parties believe that this settlement is fair and reasonable. Although there is a possibility that Plaintiffs could recover higher damages if the case proceeded to trial, there is also the possibility that they could receive much lower damages, or nothing at all.

### III. Settlement Terms

As set forth in the attached Settlement Agreement, the parties have agreed to settle this action for a total settlement amount of $810,000.00 (the "Settlement Amount"). Of that amount, $213,600.00 is payable to Plaintiffs' counsel (including $106,800.00 to counsel for the *Legantis* Plaintiffs and $106,800.00 to counsel for the *Ahmestasevic* Plaintiffs). Although counsel for the *Legantis* Plaintiffs incurred $2,184.00 and counsel for the *Ahmetasevic* Plaintiffs incurred $4,338.53 in expenses for filing and serving their respective complaints and conducting the depositions of Defendants Chatiris and Panagiotopoulos, in the interest of maximizing Plaintiffs' recovery, Plaintiffs' counsel have agreed to waive reimbursement of litigation expenses. Thus, Plaintiffs' counsel are solely seeking attorneys' fees in the amount of approximately 26.37% of the total Settlement Amount. The remaining $596,400.00 is payable directly to Plaintiffs (the "Net Settlement Amount").

Keeping in line with the trend in this Circuit following *Cheeks*, the parties have agreed to a wage-and-hour release for any claims arising before Plaintiffs signed the Settlement Agreement. The parties also did not include a confidentiality provision and have specifically included language in the Agreement making it clear that nothing in the Agreement precludes the parties from truthfully communicating their experiences concerning the Action or Settlement.

The agreement includes a mutual non-disparagement provision. The parties recognize that Courts have held that broad one-sided non-disparagement provisions "can be contrary to public policy because they prevent the spread of information about FLSA actions to other workers (both employees of Defendants and others), who can then use that information to vindicate their statutory rights." *Gaspar v. Pers. Touch Moving, Inc.*, No. 13 Civ. 8187 (AJN), 2015 U.S. Dist. LEXIS 162243, *3 (S.D.N.Y. Dec. 3, 2015). However, not every non-disparagement clause in a FLSA settlement is *per se* objectionable. *See Lopez v. Nights of Cabiria LLC*, 96 F. Supp. 3d 170, 180 n.65 (S.D.N.Y. 2015). Here, the non-disparagement clause contained in this agreement is permissible for two reasons:

1) Initially, the non-disparagement provision is mutual and binds Plaintiffs and Defendants. Following *Cheeks*, Courts have approved settlements containing mutual non-disparagement clauses. *See Sadana v. Park Li, Ltd.,* No. 15-CV-8772, 2015 U.S. Dist. LEXIS 19122, at *2-3 (S.D.N.Y. Feb. 17, 2016) (approving the inclusion of a mutual non-disparagement clause in a FLSA settlement agreement); *Caprile v. Harabel*, No. 14-CV-6386, 2015 U.S. Dist. LEXIS 127332 at *3 (S.D.N.Y. Sept. 17, 2015) (post *Cheeks* decision approving mutual non-disparagement clause but rejecting the inclusion of a confidentiality provision).

2) Moreover, in recognition of the public policy interest favoring the disclosure of information relating to this action, the non-disparagement clause contains a "carve-out" provision permitting the Parties to make truthful statements about their experience in this litigation.  Courts have held that such a "carve-out" provision provides an equitable balance between Plaintiffs' rights under the FLSA, and Defendants' interest in preventing the dissemination of defamatory statements.  *See Cionca v. Interactive Realty LLC*, No. 15-CV-05123 (BCM), 2016 U.S. Dist. LEXIS 77372 at *8 (S.D.N.Y. July 10, 2016) (a clause which bars a plaintiff from making negative statements about a defendant "must include a carve-out for truthful statements about [a plaintiff's] experience in litigating [her] case."); *Lopez v. Poko-St. Anns L.P.,* No. 15-CV-4980 (BCM), 2016 U.S. Dist. LEXIS 46862 at fn. 1 (S.D.N.Y. April 4, 2016) (approving bilateral non-disparagement clause containing a "carve-out" provision for truthful statements); *Panganiban v. Medex Diagnostic & Treatment Ctr. LLC,* No. 15-CV-2588 (AMD)(LB), 2016 U.S. DIST LEXIS 29158 at * 6 (E.D.N.Y. Mar. 7, 2016) (approving reciprocal non-disparagement clause with a "carve out" for truthful statements about [plaintiff's] experience litigating the FLSA action); *Cortes v. New Creators, Inc*., No. 15 Civ. 5680, 2016 U.S. Dist. LEXIS 79757, *4 (S.D.N.Y. June 20, 2016) (approving non-disparagement clause that "includes the requisite 'carve-out' for truthful statements about plaintiffs' experience litigating this case").

As well, the mutual non-disparagement clause is bolstered by additional provisions that permit either party to commence an action in the event of a breach of the agreement and to obtain reasonable attorneys' fees in the event that they prevail.

### IV.     Plaintiffs' Attorney's Fees and Expenses

Pursuant to Time and Expense Report as of August 30, 2019 between Pardalis & Nohavicka LLP and the *Legantis Plaintiffs* along with the Affidavit of Anastasi Pardalis, Plaintiffs' counsel billed on an hourly rate of $400.00 for the above reference matter (Exhibit B), Plaintiffs' counsel has spent more than 319 hours in prosecuting and settling this matter, resulting in a lodestar of $129,919.08.[4] Plaintiffs' counsel in the *Legantis* matter has spent $2,184.00 in actual litigation expenses.

As set forth in the attached Affidavit of Brent E. Pelton, Esq. (Exhibit C) as of August 30, 2019, counsel for the *Ahmetasevic* Plaintiffs has spent more than 338 hours in prosecuting and settling this matter, resulting in a lodestar of $114,735.42 Plaintiffs' counsel has spent $4,338.53 in actual litigation expenses.

---

[4]Ariadne Panagopoulou, Esq, a former associate with the Pardalis firm, had performed a portion of the work on this file. From the time of Attorney Panagopoulou's departure from the firm, the billing system used by the Pardalis firm [CLIO] globally replaced  Attorney Panagopoulou's name with Anastasi Pardalis's name.  Anastasi Pardalis is a founding partner of Pardalis & Nohavicka LLP, , and he supervised and approved ALL work performed on this file since its inception.

The portion of the settlement amount that plaintiffs seek as attorney's fees (i.e. $213,600.00) represents approximately 26.37% of the settlement amount, which is less than the lodestar amount and is less than what was agreed upon between the Plaintiffs and their counsel in their retainer agreements. The retainer agreement between Plaintiffs and their counsel set forth a contingency fee of one-third (1/3) of any settlement, plus reimbursement of actual litigation costs.

The hourly billing rates utilized by Plaintiffs' counsel in calculating the lodestar are within the range paid to attorneys of similar experience and professional focus in the Southern District of New York. In fact, similar rates have been approved in connection with a recent wage and hour settlement in the Eastern District, which customarily has slightly lower rates than the SDNY. *See Hall v. Prosource Techs., LLC*, 14-cv-2502, 2016 U.S. Dist. LEXIS 53791 at *38-41 (E.D.N.Y. April 11, 2016). Accordingly, Plaintiffs' counsel submits that the attorney's fees component of the settlement is fair and reasonable.

For the purposes of this settlement, Defendants take no position with respect to Plaintiffs' counsel's request for attorneys' fees.

**V.      The Parties Believe that the Settlement Is Fair and Reasonable**

An FLSA settlement should receive judicial approval where it is "fair and reasonable." *See Cheeks*, *supra*; *Wolinsky v. Scholastic, Inc*. 900 F. Supp. 2d 332, 335 (S.D.N.Y. 2012).[5] Generally, there is a "strong presumption in favor of finding a settlement fair," as "the Court is generally not in as good a position as the parties to determine the reasonableness of an FLSA settlement." *Crabtree v. Volkert, Inc*., No. 11-cv-0529, 2013 U.S. Dist. LEXIS 20543, at *8 (S.D. Ala. Feb. 14, 2013). Moreover, "[c]ourts approve FLSA settlements when they are reached as a result of contested litigation to resolve *bona fide* disputes." *In re Penthouse Executive Club Compensation Litig*., No. 10-cv-1145, 2014 U.S. Dist. LEXIS 5864, at *22 (S.D.N.Y. Jan. 14, 2014) (noting that the inherent adversarial nature of a litigated FLSA case is adequate indicator of fairness of settlement). In considering whether a settlement is fair and reasonable, the principal question is "whether the agreement reflects a 'reasonable compromise of disputed issues [rather] than a mere waiver of statutory rights brought about by an employer's overreaching.'" *Le v. SITA Info. Networking Computing USA, Inc.*, No. 07-cv-86, 2008 U.S. Dist. LEXIS 20786 at *2 (E.D.N.Y. Mar. 13, 2008) (*quoting Lynn's Food,* 679 F.2d at 1354). Although the FLSA places "limits on an employee's ability to waive claims . . . for fear that employers would [otherwise] coerce employees into settlement and waiver," *Wolinsky*, 900 F. Supp. 2d at 335 (alteration in original) (internal quotation marks omitted), "these concerns are not as relevant when the plaintiffs no longer work for the defendant, as is the case here." *Cisneros v. Schnipper Restaurant LLC*, No. 13-cv-6266, 2014 U.S. Dist. LEXIS 2111, *3 (S.D.N.Y. Jan. 8, 2014).

Here, there is no question that the settlement did not come about because of "overreaching" by the employer. To the contrary, the settlement was the result of vigorous arm's-length

---

[5] The parties note that *Cheeks* relies heavily on the Eleventh Circuit's decision in *Lynn's Food Stores, Inc. v. United States Dep't of Labor*, 679 F.2d 1350, 1355 (11th Cir. 1982), and that the Eleventh Circuit itself has subsequently contemplated that the supervision doctrine laid out in that case may apply only where a "compromise" of an FLSA claim has occurred. *Silva v. Miller*, 307 Fed. Appx. 349, 351 (11th Cir. 2009).

negotiations, including a full-day mediation with Robert Kheel, Esq. of the SDNY Mediation Program, followed by approximately one year of continued settlement discussions. The parties are represented by counsel experienced in wage and hour law who duly counseled their respective clients on the benefits and risks of continued litigation. The negotiated settlement is fair and reasonable when considered in the context of the litigation risks faced by Plaintiffs and the risk that recovery after trial would be less than the negotiated settlement amount. Settlement at this stage of the case unquestionably constitutes the most efficient and effective conclusion to this litigation. Defendants asserted legitimate substantive defenses which highlighted substantial risk to Plaintiffs' ability to continue this FLSA litigation. *Lundy v. Catholic Health Sys. of Long Island, Inc.*, 711 F.3d 106, 115 (2d Cir. 2013) (FLSA protects only minimum wage and overtime). Arm's-length negotiations between knowledgeable counsel followed, culminating in a negotiated resolution.

*   *   *   *   *

As demonstrated above, the settlement is a result of substantial negotiations and compromise by both parties. The parties believe that the settlement is completely fair, reasonable, and adequate to the Plaintiffs and respectfully request that the Court approve the Agreement.

We appreciate Your Honor's attention to this matter. Please contact the undersigned counsel for the parties should you have any questions regarding this submission.

Respectfully submitted,

| | |
|---|---|
| **PELTON GRAHAM LLC** | **Law Offices of Mitchell S. Segal, P.C.** |
| By: _/s/ Brent E. Pelton_ | By: _/s/ Mitchell S. Segal_ |
| Brent E. Pelton | Mitchell S. Segal |
| Taylor B. Graham | 1010 Northern Boulevard, Suite 208 |
| Kristen E. Boysen | Great Neck, NY 11021 |
| 111 Broadway, Suite 1503 | Telephone: (516) 415-0100 |
| New York, NY 10006 | |
| Telephone: (212) 385-9700 | *Attorneys for all Defendants* |
| | |
| *Attorneys for the* Ahmestasevic *Plaintiffs* | |

**PARDALIS & NOHAVICKA, LLP**

By: _/s/ Anatasi Pardalis_
Anastasi Pardalis

HON. GREGORY H. WOODS
FLSA SETTLEMENT FAIRNESS LETTER
PAGE **13** OF **13**

Joseph D. Nohavicka
34-03 Broadway
Astoria, NY 11106
Telephone: (718) 777-0400

*Attorneys for the* Legantis *Plaintiffs*

Enclosures

cc:     All counsel (via ECF)